IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| REGINALD DARNELL JACOBS, | * | |
| Plaintiff, | * | |
| v. | * | Case No.: 8:17-cv-00678-PWG |
| BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY et al. | * | |
| Defendant. | * | |

## MEMORANDUM OPINION

This case stems from a November 2013 confrontation between a school resource officer ("SRO")[1] and a student at Suitland High School in Prince George's County, Maryland. The student, Reginald Jacobs, alleges the SRO punched him in the face in a hallway outside the school gym just a few minutes after the school day ended. He has brought this lawsuit against the SRO, the County, and the Board of Education.

The County and the Board of Education have filed a motion for summary judgment, asserting they cannot be liable under 42 U.S.C. § 1983 or the Maryland Declaration of Rights. They first argue the SRO – who had removed his badge, gun, and protective vest moments before

---

[1] SROs have played an increasingly prominent role in public schools over the past two decades, both in Maryland and across the nation. *See generally* Kerrin C. Wolf, *Assessing Students' Civil Rights Claims Against School Resource Officers*, 38 Pace L. Rev. 215, 220-24 (2018); Kelli L. Cover, Comment, *Baltimore City Schools Need Many Things – A Personal Police Force Is Not One of Them*, 48 U. Balt. L.F. 69, 71-74 (2018). Maryland law defines an SRO as a "law enforcement officer . . . who has been assigned to a school in accordance with a memorandum of understanding between the chief of a law enforcement agency . . . and the local education agency." Md. Code Ann., Educ. § 7-1501; *accord* § 26-102.

1

the assault – was not acting within the scope of his employment at the time of the incident. They also argue the school board is not a proper defendant because it did not directly employ the SRO.

I do not find either of these arguments persuasive, as presented. Accordingly, the motion for summary judgment will be denied.

## FACTUAL BACKGROUND

The incident that precipitated this suit took place on November 12, 2013, as school was letting out for the day. The SRO, Charles Pickard, testified in an earlier proceeding that he confronted Jacobs, then 17, outside the gymnasium after hearing him say, "Fuck the police."[2] *See* Pickard Test. 330:7, ECF No. 66, Ex. 1. Pickard had known Jacobs from past encounters at the school, but because a ski mask was obstructing part of the student's face, he did not immediately recognize him. *See id.* at 331:1, 9; *see* Pickard Dep. 37:1-7, 40:6-13, 44:17-21, ECF No. 66, Ex. 2.

When Pickard pressed the student to explain the outburst, the student – who was not wearing a school uniform – allegedly said, "I have a gun, too." Pickard Test. 330:11-331:11. Pickard immediately reached out to frisk the student's waistband for weapons. *See id.* at 331:19-24. The student allegedly pushed the officer's hands away. *See id.* at 331:25-332:1. Pickard continued to pat him down. *See id.* at 322:3-6. He did not find a weapon, but he felt a "spongy-like object" in the student's left pocket, which, because of the way the student smelled, he suspected was one or more bags of marijuana. *Id.* at 332:5-15.

---

[2] Jacobs said he was merely leaving the gymnasium after playing basketball and that Pickard, without any provocation, called out for him to "come here." *See* Jacobs Dep. 60:4-62:5, ECF No. 66, Ex. 7. According to this account, Officer Pickard immediately took off his gun and vest and said, "Let's go to the body." *Id.* at 61:16-62:5.

2

Pickard rolled up the student's ski mask, at which point he recognized the young man as Jacobs. *See id.* at 332:16-17. When, according to the officer's testimony, he asked Jacobs to tell him what was going on, Jacobs said, "F that police stuff. . . . I ain't messing with the badge and gun shit." *Id.* at 333:10-13.

The two rounded the corner to an empty hallway. *See id.* at 337:25-338:3. At that point, Pickard – in what he would later concede was "a stupid thing to do" – removed his badge, gun belt (including his gun, handcuffs, baton, and pepper spray), and vest, placing them on the ground. *See id.* at 336:23-337:3; Pickard Dep. 51:4-12. His thinking, he testified, was: "[M]aybe I could relate to him. Maybe we can connect, you know. Maybe this thing can de-escalate." Pickard Test. 337:2-8.

Pickard pressed Jacobs to give up any marijuana he might have on him, saying he would "just confiscate it, [and] you'll be on your away." *Id.* at 339:6-11. He purportedly tried several times to reach into Jacobs' pocket, but Jacobs kept pushing his hand away. *See* 340:21-341:6.

A surveillance video of the encounter in the empty hallway appears to show Pickard grabbing Jacobs and pushing him against a wall. *See* ECF No. 66, Ex. 3A. At one point, the officer backs up and drops to his knees, folding his hands as if in prayer or as if he was pleading with the young man. "I said, hey, look, man, I'm praying please don't touch me no more," Pickard later testified.[3] The video (which, though helpful, is of limited value in clearly ascertaining what took place) appears to show Pickard rise to his feet and punch Jacobs in the head, knocking him to the ground. The officer's testimony was that Jacobs – possibly startled when the policeman "popped up" from the kneeling position – was simply off balance, and fell. *See* Pickard Test.

---

[3] Jacobs more or less confirms this part of the account, saying Pickard "got on his hands and knees and beg[ged] . . . 'Please don't hit me, please don't hit me.'" Jacobs Dep. 68:3-6.

342:20-343:2. He said he merely grabbed Jacobs's hood "so he wouldn't hit the ground hard." *Id.* at 343:3-8, 354.

Standing over Jacobs, who was "balled up" on the floor, Pickard reached into the young man's pocket, where, instead of marijuana, he found a set of earbuds. *Id.* at 343:22-344:3; *see* Pickard Dep. 53:5-9. Undeterred, Pickard recovered his badge, gun, and vest, placed Jacobs in handcuffs, and escorted him to the school's security office. *See* Pickard Test. 344:12-15; Pickard Dep. 58-1. He then placed Jacobs in his police car and drove him to the Palmer Park police station. *See* Pickard Dep. 59:7-60:17. Pickard filled out a form to charge Jacobs with second-degree assault and disorderly conduct. *See* Pickard Test. 377:23-378:9.

Jacobs was never prosecuted. *See* Mot. Summ. J. 2. Pickard, though, was. In 2015, a circuit court judge in Prince George's County convicted him of reckless endangerment, misconduct in office, and second-degree assault. *See* Pickard Dep. 72:10-73:9; Am. Compl. ¶ 23, ECF No. 22. The judge issued him a suspended prison sentence and placed him on supervised probation for three years. *See id.*

Separately, an internal investigation by the Prince George's County Police Department found Pickard's actions that afternoon were both unlawful and "unbecoming" of a police officer. *See* ECF No. 66, Ex. 9. Accordingly, on July 30, 2015, the Department fired him. *See id.*

Jacobs filed this lawsuit in the Prince George's County circuit court on November 3, 2016, naming not only Pickard as a defendant, but also Prince George's County (the "County"), the Prince George's County Board of Education (the "Board"), and the Prince George's County Police Department. *See* Compl., ECF No. 2. The County removed the case to this Court in March 2017. *See* ECF No. 1.

A subsequently filed Amended Complaint, which dropped the police department as a defendant, sought to hold the three remaining defendants liable under 42 U.S.C. § 1983 (Count I) and Articles 24 and 26 of the Maryland Declaration of Rights (Count II). With regard to the County and Board, the Amended Complaint asserted that their policies and practices enabled the alleged assault in violation of Jacobs's constitutional rights. *See* Am. Compl. ¶¶ 32, 46. Counts III and IV of the Amended Complaint brought claims against Pickard exclusively, accusing him of battery and false imprisonment. *See id.* ¶¶ 55-73.

The Board and County first moved to dismiss Counts I and II under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* ECF Nos. 25, 26. I denied the motions, concluding that Jacobs had plausibly claimed that the County "knew of, but failed to address adequately, a custom of its police officers to use excessive force." Mem. Op. 2, ECF No. 34.

Following discovery, the Board and County moved for summary judgment. *See* ECF No. 63. Their argument, in the main, is that they cannot be liable under either § 1983 or the state constitution because Pickard was not acting within the scope of his employment when he assaulted Jacobs. Pickard and Jacobs have each opposed the motion. *See* ECF Nos. 64, 65.

Having been fully briefed, the motion for summary judgment is now ripe for decision. No hearing is necessary. *See* Loc. R. 105.6.

## STANDARD OF REVIEW

A district court must grant summary judgment upon a showing "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Cole v. Prince George's Cty.*, 798 F. Supp. 2d 739, 742 (D. Md. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A party asserting that a fact is undisputed "must support the assertion by citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he court must construe the facts alleged in the light most favorable to the party opposing the motion." *Dent v. Montgomery Cty. Police Dep't*, 745 F. Supp. 2d 648, 655 (D. Md. 2010). If, upon review, "there clearly exist factual issues 'that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party,' then summary judgment is inappropriate." *Gennell v. Denny's Corp.*, 378 F. Supp. 2d 551, 556 (D. Md. 2005) (quoting *Anderson*, 477 U.S. at 250).

## DISCUSSION

The motion for summary judgment presents two distinct but related questions. The first is whether the County and Board (collectively, the "County Defendants") are entitled to summary judgment on Counts I and II because Pickard, in their view, was acting outside the scope of his official duties when he struck Jacobs. The second is whether the Board is exempt from liability on the ground that it was not technically Pickard's employer at the time of the incident. I will address each of these questions in turn.

### A.

The County Defendants argue, first, that they cannot be liable under either § 1983 or the Maryland Declaration of Rights because Pickard's actions on November 12, 2013, "were purely personal and based on his personal relationship with Jacobs and in no way furthered the County's or Board's interest." Mot. Summ. J. 7. While they concede that Pickard was acting in his official capacity when he first confronted Jacobs and frisked him for weapons, they say the encounter took on an altogether different dimension when he removed his badge, gun, and vest. *See id.* at 10-12.

At that point, they say, Pickard "ceased acting as a Resource Officer," Reply 3, ECF No. 66, and sought only to mentor a young man he had known from past interactions – a function that, they contend, "is not part of his job duties as a Prince George's County police officer or Resource Officer," Mot. Summ. J. 11-12.

I will assume, without deciding, that "scope of employment" is an essential element of Jacobs's claims under § 1983 and the Maryland Declaration of Rights.[4] The County Defendants motion fails, in any event, because they have not persuaded me of the absence of a genuine dispute on this issue. That is to say, I do not agree with the County Defendants that the evidence would not permit a reasonable jury to find that Pickard was, indeed, acting within the scope of his official duties when he assaulted Jacobs in the school hallway.

The County Defendants, drawing on Maryland law, contend the proper test of whether an officer was acting within the scope of his employment is "whether the actions were committed in furtherance of the employer's business" and were "committed during the performance of the duties

---

[4] The County Defendants' motion provides no support for this assumption. The motion bypasses any discussion of the elements of the causes of action Jacobs has asserted against them. I note, too, that the case they lean on most heavily, *Sawyer v. Humphries*, 587 A.2d 467 (Md. 1991), is a state court case that did not involve any claims under § 1983 or the Maryland Declaration of Rights. The question in *Sawyer*, rather, was whether an off-duty state police officer accused of throwing a rock at a car and beating up a motorist was entitled to immunity under the Maryland Tort Claims Act. 587 A.2d at 468-69. "Scope of employment" was plainly at issue there, because the Maryland statute expressly immunized state employees acting "within the scope of [their] public duties." *Id.* at 469 (quoting Md. Code Ann., State Gov't § 12-105 (1984)).

The legal issue here is not precisely the same. Jacobs, in seeking to hold local government entities liable under § 1983, must show that their policies or customs were a "moving force" behind the deprivation of his constitutional rights. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting *Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981)); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). To accept the County Defendants' position, I would have to suppose that a government entity's policies or customs cannot have this effect if the officer responsible for the deprivation was acting outside the scope of his employment. Here, though, because I conclude the County Defendants have failed to establish the absence of a genuine dispute of material fact, I do not need to reach this issue.

entrusted to him by the employer, even though not expressly authorized." Mot. Summ. J. 7 (citing *Sawyer v. Humphries*, 587 A.2d 467, 470-71 (Md. 1991)). Factors indicating an officer's actions fall outside of official duties, they say, are: "(a) the employee's conduct was personal; (b) the conduct represents a departure from the purpose of furthering the employer's business; and (c) the employee is acting to protect his own interest, even if committed during normal duty hours and at an authorized locality." *Id.* at 8 (citing *Sawyer*, 587 A.2d at 471).

Applying this test here, the County Defendants say the undisputed facts show Pickard's actions after frisking Jacobs were "clearly personal and in no way in furtherance of any legitimate governmental purpose." *Id.* at 9. I do not agree.

Among the weaknesses of the County Defendants' argument is that it asks this Court to take an overly narrow view of Pickard's duties as an SRO. Their motion, citing Pickard's testimony in the 2015 criminal trial, limits those duties to simply "enforcing the laws of the State of Maryland, enforcing the rules of Suitland High School, and educating students as to the law." Mot. Summ. J. 9 (citing Pickard Test. 321:2-8). That, however, is not how Pickard characterized his responsibilities. On the contrary, Pickard testified that his functions included "counseling" and "educating students." Pickard Test. 321:2-8. When asked how he, as an SRO, approached the challenges he encountered at Suitland High School, Pickard said he "participated in coaching and mentoring and counseling the kids, also doing after-school programs with the students at Suitland, educating them on how being stopped by the police in your community, how you're supposed to handle yourselves and how you can de-escalate a lot of things before it can escalate." *Id.* at 323:23-324:6.

These activities were not confined to after-school hours. In his deposition, Pickard said he sometimes played basketball with students during their physical education classes. *See* Pickard

Dep. 40:10-13. He did this, he said, not for personal reasons, but to "build a rapport with certain kids that I had been told to talk to." *Id.* at 40:17-19. This, in fact, is what Pickard said he was doing just before his run-in with Jacobs outside the school gymnasium on November 12, 2013. *See id.* at 45:13-46:5.

Pickard's deposition testimony further undermines the County Defendants' assertion that his interest in speaking with Jacobs was purely personal.[5] *See* Reply 3-4. Pickard explained that the reason he "felt the need to reach out and help" Jacobs was because Jacobs "was known to deal with guns and so forth, and I have took [sic] a lot of guns out of Suitland." Pickard Dep. 41:13-17. Describing some of their earlier interactions, before the November 2013 confrontation, he said he sometimes caught Jacobs trying to leave school grounds while classes were still in session. *See id.* at 42:3-8. Pickard, explaining that monitoring the perimeter of the school property was one of his job responsibilities, said he would "try to talk him out of it." *Id.* at 43:5.

On other occasions, he recalled, he gave Jacobs money to buy a snack or drink from the school vending machine. *Id.* at 44:17-21. Again, Pickard said his motivation was "building rapport." *Id.* at 45:1-2. He considered this important, he said, because the school's gang specialist had advised him to "keep a close eye on this kid." *Id.* at 45:3-7.

---

[5] As to this point, the County Defendants argue the Maryland Court of Appeals's decision in *Wolfe v. Anne Arundel County*, 821 A.2d 52 (Md. 2003), supports their contention that "Pickard's conduct did not and could not be committed in furtherance of any legitimate objective of the Board of Education and County." Reply 7; *see* Mot. Summ. J. 9. The circumstances in *Wolfe*, though, could hardly be more different from the facts here. In *Wolfe*, an on-duty county police officer forcibly raped a woman in his police car. 821 A.2d at 53. There was never any question that the officer raped her for any purpose other than his own gratification, and, indeed, the officer conceded that the rape was outside the scope of his employment. *See id.* at 58. The issue before the court was simply whether the county self-insurance program "covered certain actions of an employee *outside* the scope of employment." *Id.* (emphasis added). The court's determination that it did not does not in any way support the County Defendants' position here.

9

The County Defendants' motion overlooks these portions of Pickard's testimony. All of them, though, can be found in the exhibits the County Defendants themselves enclosed along with the briefing on their motion, and construed in any light (let alone the "light most favorable" to Jacobs), these statements amply support an inference that Pickard's purpose in confronting Jacobs was related to his work as an SRO.

To be clear, the County Defendants do not dispute that Pickard was engaged in police work when he first approached Jacobs and frisked him for weapons. Their argument, rather, is that Pickard "ceased acting as a Resource Officer when he dispelled his suspicion that Jacobs was either armed or in possession of marijuana." Reply 3. They reason that, at that point, there was no longer reasonable suspicion to detain Jacobs, and so "the law and his training required Pickard to release Jacobs." *Id.*

This argument fails for several reasons. For one thing, it misstates the facts. Contrary to their contention, the evidence does not establish that, following the frisk, Pickard no longer had reason to suspect Jacobs was carrying marijuana. Pickard testified in his criminal trial that Jacobs smelled of "burnt marijuana." Pickard Test. 332:14-15. He also said that, while frisking Jacobs, he felt a "spongy-like object" that felt to him like "maybe two bags of marijuana." *Id.* at 332:5-10. He said he tried at least three times to search Jacobs's pocket, but Jacobs pushed his hand away each time. *See id.* at 334:19-25.

Pickard's testimony was that the pat down aroused his suspicion that Jacobs had marijuana in his pocket. *See id.* at 335:10-11. Whether, as a matter of constitutional law, his observations were sufficient to permit him to detain Jacobs is immaterial. While the County Defendants' argument invokes the language of constitutional law, the issue before me is not whether Pickard had a reasonable, articulable suspicion to seize Jacobs under the Fourth Amendment to the U.S.

Constitution – or even whether there was, in fact, a seizure. The question, rather, is whether the confrontation between the officer and the student fell within the scope of the officer's employment. To that end, Pickard's testimony indicates that he suspected Jacobs had drugs in his pocket. Pickard also testified that, after taking off his badge, gun belt, and vest, he tried to persuade Jacobs to let him "confiscate" the marijuana. *Id.* at 339:6-9. "I just wanted to get to his pocket, finish the whole investigation and send him on his way," Pickard said. *Id.* at 339:14-16. These statements are wholly at odds with the County Defendants' contention that Pickard's reasons for interacting with Jacobs were unrelated to police work.

Granted, there is no dispute that Pickard removed his badge, gun, and vest before striking Jacobs. The County Defendants argue this decision "demonstrated his intent to not be viewed as a police officer." Mot. Summ. J. 10. It seems to me, though, that the pertinent question here is not how Pickard wanted *Jacobs* to perceive him. Certainly, in other circumstances, there may be legitimate reasons for an officer to create an impression that their conversation is unconnected to a police investigation. *See, e.g., Illinois v. Perkins*, 496 U.S. 292, 300 (1990). Here – while acknowledging that what he did may have been "the stupidest thing in America" – Pickard asserted that his goal was to "keep everything . . . diffused" so he could continue talking to Jacobs. Pickard Interview 8:360, 10:420-21, ECF No. 66, Ex. 4. A reasonable juror, should he or she credit this testimony, could find that Pickard's actions – however ill advised – were inextricably linked with his duties as an SRO.

None of this, of course, precludes the County Defendants from attempting to prove at trial that Pickard's reasons for speaking with Jacobs were strictly personal. Here, though, at the summary judgment stage, they must show that no reasonable juror could find otherwise. *See Scott*

*v. Harris*, 550 U.S. 372, 380 (2007). The County Defendants have not met their burden and are therefore not entitled to summary judgment on this issue.

**B.**

The second and final argument in the County Defendants' motion would excuse the Board as a defendant in this suit on the ground that "Jacobs cannot establish an employment relationship between the Board of Education and Pickard." Mot. Summ. J. 12. I quote this section of the motion in full:

> There is absolutely no evidence that the Board of Education for Prince George's County selected Pickard as their resource officer, hired Pickard, evaluated Pickard's performance, paid his salary, or dictated his duties and responsibilities. Moreover, there is no evidence that the Board of Education had any control over how Pickard conducted himself at the school. Thus, for the reasons previously discussed herein, this Court must find that Pickard was not an employee of the Board of Education for Prince George's County.

*Id.*

"Rule 56 requires that a movant '*show*[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Lee v. CertainTeed Corp.*, No. 5:13-826-FL, 2015 WL 12857326, at *3 (E.D.N.C. July 20, 2015) (emphasis in original) (quoting Fed. R. Civ. P. 56(a)). The lone paragraph the County Defendants devote to the Board's argument does not make the requisite showing. First, it cites no authority for the proposition that a county school board must directly employ an SRO in order to be liable under § 1983 or the Maryland Declaration of Rights for the SRO's tortious conduct. The County Defendants simply take this as a given, despite the existence of at least some authority to the contrary. *See, e.g., DeCossas v. St. Tammany Parish Sch. Bd.*, No. 16-3786, 2017 WL 3438347, at *5 (E.D. La. Aug. 10, 2017) (assuming, but not deciding, that an SRO could be considered a school board's "agent" in a § 1983

12

suit, even though the SRO's direct employer was not the board, but the parish sheriff's office); *Savage v. Carter Cty. Bd. of Educ.*, No. 07-118-ART, 2009 WL 1884137, at *5-6 (E.D. Ky. June 30, 2009) (contemplating that a school board may be liable for policies or customs enabling an SRO to violate a student's constitutional rights, but granting summary judgment for the board because the plaintiff had failed to show wrongdoing on the board's part).

Second, the motion makes no attempt to satisfy the County Defendants' burden under Rule 56(c), which requires a party "asserting that a fact cannot be . . . genuinely disputed" to

> support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).[6] The section of the motion devoted to the Board's argument does not contain a single citation, either to legal authority or to materials in the record. It neglects to call my attention to any evidence establishing that the Board was not Pickard's employer, or that some other entity was. As the County Defendants have not met their burden under the rule, their motion is deficient, and it will be denied. *See Lee*, 2015 WL 12857326 at *3.

## C.

I have now addressed both of the arguments the County Defendants raised in their motion for summary judgment. There are three remaining issues, though, that I would like to see the parties address before this case proceeds to trial.

---

[6] The County Defendants' own motion notes that they, as the moving party, have "the initial responsibility of informing the District Court of the basis for [their] motion and then identifying those portions of the record which [they] believe demonstrate the absence of a genuine issue of material fact." Mot. Summ. J. 2 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

First, it remains unclear to me exactly which constitutional rights Jacobs wishes to vindicate in his § 1983 claim (Count I). The Amended Complaint references the Fourth, Fifth, Eighth, and Fourteenth Amendments. *See* Am. Compl. ¶ 32. I observe, though, that Jacobs deleted from his original Complaint several passages alleging he had suffered "cruel and unusual punishment," suggesting the reference to the Eighth Amendment may have been inserted in error. *Compare* Am. Compl. ¶¶ 30-54, *with* Compl. ¶¶ 23, 33, 35, 39.

The Eighth Amendment "protects the rights of *postconviction* detainees." *B.N.S. ex rel. Stuart v. Brito*, No. ELH-17-2670, 2018 WL 5830565, at *8 (D. Md. Nov. 6, 2018) (emphasis in original). As the Supreme Court has stated, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. . . . The State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilty in accordance with due process of law." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (alteration in original) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977)); *see Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001).

It appears to me that Jacobs does not intend to assert an Eighth Amendment claim. However, to clear up any confusion as this case proceeds, I am directing him to file a letter indicating whether Count I does in fact encompass such a claim. Given the authority cited above, if Jacobs does intend to assert an Eighth Amendment claim, the letter must set forth authority for him to do so where, as here, his encounter with Pickard most certainly was not "postconviction." The letter must not exceed three pages, single spaced.

Second, the parties have not filed any briefing to date addressing whether, as a general matter, a § 1983 claim may lie against a county school board as constituted under Maryland law.

*See J.G. ex rel. Gusman v. Prince George's Cty. Bd. of Educ.*, No. PWG-16-1008, 2017 WL 930130, at *4 (D. Md. Mar. 8, 2017); *Wood v. Bd. of Educ. Of Charles Cty.*, No. GJH-16-239, 2016 WL 8669913, at *5 (D. Md. Sept. 30, 2016). I am directing the parties to brief this issue as well, in accordance with the order accompanying this memorandum opinion.

Finally, the County Defendants have not sought a ruling on whether, at the summary judgment stage, Jacobs is able to show "the existence of an official policy or custom that is fairly attributable to [County Defendants] and that proximately caused the deprivation of [his] rights." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). I examined this issue in response to the County's May 2017 motion to dismiss, ECF No. 24, and while I concluded at that time that Jacobs had "plausibly alleged that the County knew of, but failed to address adequately, a custom of its police officers to use excessive force," Mem. Op. 2, the parties have not indicated whether evidence uncovered in discovery substantiated those allegations.

"District courts have an inherent power to grant summary judgment *sua sponte* so long as the party against whom summary judgment is entered has notice 'sufficient to provide it with an adequate opportunity to demonstrate a genuine issue of material fact.'" *J.G. ex rel. Gusman*, 2017 WL 930130 at *6 (quoting *Allstate Ins. Co. v. Fritz*, 452 F.3d 316, 323 (4th Cir. 2006)). As neither party has briefed this issue, I do not consider a *sua sponte* grant of summary judgment appropriate at this time. I do, however, want the County Defendants to indicate whether they concede that Jacobs has presented a triable *Monell* claim following my ruling on their motion for summary judgment. If, indeed, that is not the case, then it would seem to me that the Court's and parties' interest in streamlining this case ahead of trial requires the parties to brief this issue. The parties' briefs should likewise state their views on whether the trial should be bifurcated.

A briefing schedule and related instructions are included in the Order accompanying this Memorandum Opinion.

## CONCLUSION

The County Defendants have not shown that they are entitled to summary judgment under Rule 56 with respect to the two issues they raised. Accordingly, their motion is denied. However, before this case proceeds to trial, I am ordering Jacobs to file a brief letter clarifying which constitutional rights he seeks to vindicate under § 1983. I also am ordering the parties to submit briefing on two other issues: whether Jacobs's § 1983 claim lies against the Board as a matter of law, and whether the County Defendants are entitled to summary judgment on their *Monell* claim. As to this additional briefing, the County Defendants shall file first; the Plaintiff will file a response, as may Pickard (so long as it is not duplicative of what the Plaintiff has argued); and the County Defendants may file a reply. Deadlines and page limits are specified in the Order accompanying this Memorandum Opinion.

Date: March 21, 2019

Paul W. Grimm
United States District Judge